DECISION
On March 24, 1994, a duly constituted grand jury of the State of Rhode Island returned a multi-count indictment against former Governor Edward D. DiPrete and his son, Dennis L. DiPrete, (defendants), alleging that at various times between January 1, 1985, and December 31, 1990, they engaged in racketeering activities consisting of multiple enumerated acts of bribery and extortion together with several named unindicted coconspirators, including Rodney M. Brusini, Frank N. Zaino, and Michael Piccoli. Other individuals named to support the allegations in the indictment, among them Mathies Santos, had been either immunized or granted letters of nonprosecution or promises of nonprosecution by the Department of the Attorney General. The alleged acts of racketeering activity (bribery and extortion) also comprised the basis for specific counts of the indictment. In addition, defendant Edward D. DiPrete was charged with two counts of perjury, which were severed by the court and which are not included in the subject matter of the instant proceeding.
Defendants have filed a Motion for Remedial Sanctions alleging prosecutorial misconduct during the pretrial stages of this case emanating from alleged continuous violations of the State's agreed to and/or constitutional obligations to provide certain material to the defense as well as violation of specific orders of this court. Therefore, the issue before the court is not one of defendants' guilt or innocence but rather one of alleged prosecutorial misconduct affecting constitutional due process rights of the defendants.
It appears from the evidence that interest in the activities of the defendants arose in 1991 as an outgrowth of the Attorney General's investigation into public corruption generally, culminating in the indictment of March 24, 1994. In June 1994, before the court became involved in pretrial discovery proceedings, without the assistance of or direction from this court, the Department of Attorney General and the defendants entered into a stipulation pursuant to which, among other things, the State agreed to provide defendants with testimony of expected trial witnesses who appeared before any grand jury after 1991 if it related to the subject matter of the indictment. In addition, the Department of Attorney General agreed to provide all relevant recorded grand-jury testimony of any person relating to the subject matter of the indictment, regardless of which grand jury heard the evidence. As to both agreements, the Department was to provide transcripts and computer discs. The Department also agreed to provide defendants with written or recorded verbatim statements, signed or unsigned, made to investigators regardless of whether the person was expected to be a witness, other than those being withheld on the basis of privilege. If there were no written or recorded verbatim statements, summaries were to be provided if available. The Department also agreed to make available to the defendants all documents within the possession of the Department of Attorney General or the State Police that related to the subject matter of the indictment, regardless of whether the State intended to introduce them as evidence at trial. In all respects, mental impressions, conclusions, or opinions of investigators or attorneys were excluded from the agreement and could be redacted. The stipulation did not preclude the filing of discovery or pretrial motions, including those which related to withheld discovery on the basis of privilege or the existence of ongoing investigations.
Beginning in April 1994, several conferences were held with the court during which schedules were established and reports made to the court relative to agreements between the parties as to discovery issues. During this time defendants were afforded access to some six hundred boxes of documents maintained by the Department in connection with the case.
In July 1995, defendants filed motions for disclosure of various materials to which the State objected. The court heard and decided the motions on August 24, 1995, except for the motion for a Bill of Particulars that was decided in part on August 29, 1995. Some of the motions were denied, others were granted intoto or in part. Specifically, among other things, this court ordered the State to produce, with respect to all unindicted coconspirators, the following: a full and complete statement of all promises, rewards, and/or inducements made in order to secure their cooperation in the investigation; a full and complete statement of the State's knowledge of any and all criminal conduct of the unindicted coconspirators, including not only criminal convictions or pending criminal charges but also information on any known criminal conduct, whether or not that conduct had been the subject of a criminal charge; and any other information relating to a coconspirator's credibility as a witness such as prior inconsistent statements, admissions of a poor memory, or evidence of bias on the part of the witness. The court also ordered the State, with respect to any prospective witness, to produce: a full and complete statement of all promises, rewards, and/or inducements offered to witnesses to secure their cooperation; any transcripts of grand-jury testimony by the witness that was being withheld; and all notes of interviews with prospective witnesses taken by any agent of the State in the course of the investigation. Said notes were to be produced to the court for an in-camera review, at which time any information relevant to ongoing investigations or protected by other privileges could be redacted. None of the court's decisions were appealed by the State, thereby requiring it to comply with the provisions thereof. In any event, the State was unquestionably obliged to honor its obligations as agreed to in the earlier stipulation.
On November 10, 1995, in response to the defendants' Motion for Exculpatory Evidence, the State represented that the information ordered to be produced in August 1995 either already had been provided or did not exist. In response to the court-ordered production of the State's knowledge of the criminal conduct of its witnesses, as well as a statement of the promises, rewards, and inducements made to its witnesses, the State directed defendants to previously produced immunity petitions and letters of nonprosecution which turned out to be an inadequate, and indeed inaccurate, response.
On November 16, 1995, the court heard arguments by defendants on a motion to dismiss the extortion-related charges, which was subsequently granted, the reasons for which are of no import in deciding the instant motion for sanctions. The State appealed the court's decision but was denied a stay, and on May 13, 1996, jury selection began for the trial of the case. The Rhode Island Supreme Court, however, reinstated the extortion-related charges, resulting in a continuance of the trial. But for the action by the Rhode Island Supreme Court, the case would have been tried in May 1996.
On July 25, 1996, in a conference call with the court and the parties, the State indicated it was withholding certain information on the basis of privilege, at which time the State was ordered to produce the materials in camera for review by the court. The following day, the Department of Attorney General offered to allow defense counsel themselves to review all the materials in the State's possession rather than go forward with the in-camera review. On July 29, 1996, the State produced thirty boxes of materials containing roughly 68,000 pages of documents that had been withheld by the State and which contained exculpatory evidence, the knowledge of which had been denied by the State's prosecutors during previous hearings when they repeatedly announced to the court that the defendants had everything to which they were entitled. Indeed, it was the State's position that there was nothing contained in the thirty boxes which defendants did not already have in some form or another. This position was maintained by a prosecutor on August 7, 1996, and also in the State's original and amended Point-By-Point Refutation of the analysis and importance of the documents relied upon by defendants in support of their Motion for Sanctions filed on August 26, 1996. The State continued to maintain this position up to and even during the hearing on the motion.
It is the material found within these boxes that form the basis for the defendants' Motion for Remedial Sanctions, the most important of the documents being appended thereto. Although defense counsel supported their motion for sanctions with some eighty-nine exhibits (some of which consist of multiple documents, a few of which they later acknowledged they in fact had) the court will focus upon those that it feels are the most important and which greatly impact upon the conduct of the prosecutors as complained of by the defendants.
The most important exhibits relate to three unindicted coconspirators, Rodney M. Brusini, Frank N. Zaino, and Michael Piccoli, who were all either granted immunity or a letter of nonprosecution by the Department of the Attorney General, and to Mathies Santos who was granted a promise of nonprosecution. This type of material, that is, evidence relating to the State's cooperating witnesses, is of great significance in this case because of the critical importance of those witnesses to the State's case against the defendants. The testimony of these cooperating witnesses and therefore the credibility of each, particularly the three unindicted coconspirators upon which for all practical purposes the indictment itself was founded, is central to the State's case.
The prosecutorial misconduct complained of by defendants relates to the State's failure to comply with the court's order of August 24, 1995, and the State's own agreements pursuant to the stipulation of June 1994 to produce the following information relative to the State's witnesses: a full and complete statement of the State's knowledge of any criminal conduct of any of its witnesses, whether or not that conduct resulted in a criminal charge or conviction; a statement of all promises, rewards, and/or inducements made in order to secure a witness's cooperation; any inconsistent statements made by witnesses during the investigation; and notes taken by investigators during interviews of potential witnesses.
Defendants claim that information extracted from the July 19, 1996 production includes information specifically, previously ordered to be produced on August 24, 1995, and relates to each major witness. For instance, as to Brusini, defendants allege that the withheld material contains evidence that the State knew Brusini had committed perjury before a grand jury in March 1992 when he denied having any ownership interest in the "Rosemac" building with Joseph Mollicone, Jr., and that Brusini had filed false documents with the State Ethics Commission in connection with this hidden ownership interest, resulting in an ethical violation. Furthermore, defendants contend that the State in fact made a promise, reward, or inducement to Brusini by dropping the perjury charge that it had initiated in return for his cooperation in the investigation of the defendants.
Defendants also allege that the withheld material indicates the State's knowledge that Brusini had committed tax fraud; that he had committed fraud by overbilling the State $350,000 for work done on the Pine Street Building, which he owned as a partner in a real estate trust that had leased the building to the State; and that the State also knew Brusini had committed insurance fraud. Moreover, the defendants claim that the State's failure to prosecute Brusini for any of this known criminal conduct constitutes a promise, reward, or inducement to Brusini and should have been disclosed as such.
The State, on the other hand, alleges that defendants in fact had access to all of this information in some form, although it now acknowledges its failure to produce many documents specifically ordered by the court. It argues, however, that because it did turn over to defense counsel an immense volume of paper that contained, in some way, evidence suggesting that Brusini committed perjury, defense counsel should have been aware of this fact. In rebuttal to the defendants' claims, the State directs defense counsel and the court to numerous other documents and exhibits previously made available to the defense that they claim contain the same information.
The defendants' claims relative to the other key witnesses are similar. As to Zaino, defendants allege that the State withheld evidence that it had knowledge of tax fraud; that the State also knew of, and even assisted in, tax evasion by Zaino by supplying the amount of additional income Zaino included in a 1991 amended tax return; that Zaino admitted to the State that he filed a false affidavit concerning his financial affairs with the Rhode Island Family Court during a divorce proceeding; and that he maintained a secret bank account at Rhode Island Hospital Trust in order to hide money from his wife during their divorce.
Defendants also claim that the State was aware of many other crimes committed by Zaino, including racketeering, extortion, obstruction of justice, conspiracy, personal tax fraud, corporate tax fraud, campaign law violations and forgery, and the State did not prosecute Zaino for any of these crimes, nor did they prosecute family members and employees of Zaino for similar crimes, as they had threatened. Defendants allege that the failure of the State to take action was actually a promise, reward, or inducement to Zaino in exchange for cooperation and should have been disclosed.
As to Piccoli, defendants allege that the appearance of a representative of the Attorney General at a sentencing hearing on behalf of Piccoli suggesting lenient treatment constitutes a promise, reward or inducement, Piccoli having pled guilty to defrauding the City of Cranston of allegedly over one million dollars. At the sentencing hearing, the State recommended that Piccoli receive no jail time and make a restitution payment of only $135,000, significantly less than the amount he fraudulently obtained. Defendants also claim that the State knew Piccoli had committed the crimes of conspiracy, bribery, and racketeering in connection with construction projects for the Rhode Island Department of Transportation and the crimes of conspiracy and bribery in connection with his position at the Rhode Island Solid Waste Management Corporation.
Finally, as to Santos, defendants allege that the State knew he had committed the crimes of bribery, extortion, and had a conflict of interest in connection with his receipt of a $142,000 loan on favorable terms from Joseph Mollicone, Jr., at a time when Santos was taking actions as a state official that benefited Mollicone. Specifically, defendants claim that Santos obtained a state agency as a tenant for a Mollicone building and pressured others to sign similar leases that would benefit Mollicone. Furthermore, defendants allege that Santos committed bank fraud in connection with the loan application to Mollicone's bank, Heritage Loan and Investment. Defendants claim that the State's failure to prosecute Santos for these crimes constitutes a promise, reward, or inducement which should have been disclosed.
According to the defendants, all of this information, and additional similar information relating to these and other witnesses, was within the State's possession and was specifically ordered to be disclosed in August 1995, but was not disclosed until it was discovered within the previously withheld thirty boxes of documents produced nearly one year later in July 1996. The defendants' positions were corroborated by testimony at the hearing that shortly after the court's August 1995 order, the work files of the original prosecutor and certain investigators were gathered and placed into ten boxes that were reviewed by prosecutors in September 1995. It was acknowledged that many of the eighty-nine exhibits not produced until July 1996 were located in these ten boxes. For its part, the State maintains that all of this information was available to the defendants through other documents previously disclosed, and that, in any event, the State should not be faulted for its allegedly inadvertent failure to comply due to the overwhelming volume of evidence in this case and the resulting nature of the State's discovery obligations.
An integral and indispensable part of the criminal justice system is an effective pretrial procedure designed to protect a defendant's right to due process. The procedure engaged in is what is commonly referred to as the discovery process, its primary purposes being to ensure that the adversary parties are adequately prepared for trial and the avoidance of surprise.
To emphasize how important to defendant the process is considered one need only refer to Rule 3.8 of the Rules of Professional Conduct as promulgated by the Rhode Island Supreme Court to regulate attorney activities, which provides in pertinent part as follows:
 "Rule 3.8. Special Responsibilities of a Prosecutor.
— The prosecutor in a criminal case shall:
 "* * *
 "(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . .
 "* * *."
 It is noted in the commentary on the rule that:
 "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. * * *."
As previously indicated, defendants assert that the behavior of the various prosecutors in this case violated their constitutional due process rights and direct the court to the violation of the stipulation between the parties, the United States Supreme Court case Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, as well as Rule 16 of the Superior Court Rules of Criminal Procedure and specific orders of this court, especially those of August 24, 1995.
Rule 16 of the Superior Court Rules of Criminal Procedure governs discovery by a defendant and provides in part:
 "16. Discovery and inspection. — (a) Discovery by Defendant. Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State: (Emphasis added.)
 "* * *."
 "(7) as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial;
 "* * *."
Rule 16 is "one of the most liberal criminal discovery mechanisms in the United States." State v. Brisson,619 A.2d 1099, 1102 (R.I. 1993)(quoting State v. Wyche, 518 A.2d 907, 910 (R.I. 1986). The purpose of the rule is to prevent surprise at trial and "ensure that both parties receive the fullest possible presentation of the facts prior to trial." State v. Garcia,643 A.2d 180, 186 (R.I. 1994)(quoting State v. Concannon,457 A.2d 1350, 1353 (R.I. 1983)). It is a well-settled rule in Rhode Island that the "trial of a criminal case is not to be considered a poker game in which each player holds his cards close to his vest." State v. Diaz, 456 A.2d 256, 258 (R.I. 1983). Rule 16 (i) provides sanctions for the failure of any party to comply with Rule 16 or any order entered pursuant to Rule 16. "The imposition of any such sanction for noncompliance with discovery obligations is a matter within the sound discretion of the trial justice and absent a clear abuse of discretion should not be overturned."Brisson, 619 A.2d at 1102. Under 16 (i), the trial justice may, "within the bounds of sound discretion," enter any order he or she deems appropriate. State v. Quintal, 479 A.2d 117, 119 (R.I. 1984).
The Rhode Island Supreme Court has held that a prosecutor's failure to comply with the requirements of pretrial discovery may violate a defendant's due process rights as guaranteed by both the Rhode Island and United States Constitutions. Concannon, 457 A.2d at 1353. The United States Supreme Court has also held that a pretrial discovery violation may infringe upon a criminal defendant's constitutional right to due process. Brady, 373 U.S. at 87. Even in the absence of a defendant's request for informational the prosecution has a constitutional duty to disclose exculpatory evidence. Garcia, 643 A.2d at 184 (citingUnited States v. Agurs, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 2401-02, 49 L.Ed.2d 342, 354-55 (1976)). All evidence that is "favorable to an accused," Brady, 373 U.S. at 87, including information that could be used to impeach the credibility of the government's witnesses, is subject to disclosure. Garcia, 643 A.2d at 184 (citing United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985).
In State v. Coelho, 454 A.2d 241 (R.I. 1982), the Rhode Island Supreme Court outlined four factors that should be considered when reviewing alleged Rule 16 violations. The trial justice should consider: 1) the reason for nondisclosure; 2) the extent of prejudice to the opposing party; 3) the feasibility of rectifying that prejudice by a continuance; and 4) any other relevant factors. In a later case, State v. Ramos, 553 A.2d 1059
(R.I. 1989), our Supreme Court indicated that in addition to the four Coelho factors "the trial justice must consider what is right and equitable under all of the circumstances. . . ." Id. at 1067 (quoting State v. Sciaria 448 A.2d 1215, 1218-19 (R.I. 1982))."
When considering an alleged discovery violation by the State, Rhode Island courts follow a "sliding-scale analysis" based on the blameworthiness of the prosecution. Brisson, 619 A.2d at 1102 (citing In Re Ouimette, 115 R.I. 169, 342 A.2d 250 (1975)). This analysis differs from the "outcome determinative" approach of the federal courts, which focuses on the impact of the nondisclosure on the trial result. Brisson, 619 A.2d at 1102 (citing Bagley,473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481). Therefore, when the four-factor test of Coelho is applied, the reason for the State's nondisclosure can be dispositive. That is, where the State has deliberately withheld evidence, the trial justice may fashion a remedy without examining the actual harm or prejudice produced by the misconduct. Garcia, 643 A.2d at 187. In that case, the Rhode Island Supreme Court held that "[i]n cases where the nondisclosure has been deliberate, the basic precepts of due process have been violated, and this court will grant a new trial without an inquiry into the degree of harm produced by the misconduct." Id. In this context, the prosecution acts deliberately when it makes "a considered decision to suppress * * * for the purpose of obstructing" or where it fails "to disclose evidence whose high value to the defense could not have escaped * * * [its] attention." State v. Wyche, 518 A.2d 907, 910 (R.I. 1986)(quoting United States v. Keogh, 391 F.2d 138, 146-47 (2nd Cir. 1968)).
Devoid of all rhetoric, the relative positions of the parties can be simply stated. The defendants claim that the conduct of the State's prosecutors, when taken as a whole, constitutes a violation of the defendants' due process rights, as well as other constitutional rights, resulting in substantive prejudice for which the appropriate remedy is either dismissal of the indictment or preclusion of the testimony of four major witnesses. On the other hand, the State argues that if there has been any constitutional violation it constitutes procedural prejudice only and, therefore, may be remedied by a reasonable continuance to allow defendants to prepare for trial, using the exculpatory evidence, all of which is now in their possession.
The court will discuss with some particularity the contents of certain withheld documents relied upon by defendants in support of their Motion for Remedial Sanctions that relate to the four major witnesses.
As to Rodney Brusini, the key issue relates to promises made to him by the State, including the State's forbearance to bring a charge of perjury against him. Upon reviewing the previously withheld evidence and the testimony offered during the hearing, it becomes clear that the State undoubtedly had knowledge that Brusini committed perjury before a grand jury in March 1992; that the State promised not to prosecute Brusini for this crime in exchange for his cooperation in this case; and that the State withheld vital information relating to this issue.
The following facts can be gleaned from a number of the previously withheld documents and the testimony received at the hearing. The Department of Attorney General began investigating the activity of Brusini as early as 1991 as an outgrowth of the investigation into Joseph Mollicone, Jr., and Heritage Loan and Investment Bank. The State was aware at that time of Brusini's involvement in filing false financial statements in connection with loan applications as far back as 1988. In January 1992, representatives of the Department of Attorney General, including J. Richard Ratcliffe, the former chief prosecutor in this case, met with Brusini to begin discussions relative to his cooperation with the DiPrete investigation. The same parties met again in February 1992 at which time the State wanted to secure a "proffer" from Brusini, which is a formal signed statement of a cooperating witness's knowledge of criminal activity and an outline of the matters to which they will testify at trial. The proffer is, for all practical purposes, the very foundation of a cooperation and immunity agreement with the State.
In March 1992, before Brusini had signed a formal proffer, he committed perjury before a grand jury by denying that he had any ownership interest in the Rosemac building, which was co-owned by him and Mollicone. It is apparent that by July 1992, the State had collected and analyzed enough evidence to come to the conclusion that Brusini should be charged with perjury, culminating in a draft indictment for that crime. Indeed, a grand jury was convened in August 1992 in an attempt to secure an indictment against Brusini, and the State called a number of witnesses and submitted evidence to the grand jury. The State also obtained handwriting exemplars from Brusini in August 1992 while the grand jury was considering the perjury charge.
In addition, the State admittedly had in its possession the testimony of some nineteen witnesses who had testified before the grand jury investigating Brusini. Although the State had repeatedly claimed that they had no knowledge of perjury by Brusini, the testimony establishes that the current prosecution team was specifically aware of these tapes by April or May 1996 at the latest. No mention of this grand-jury testimony, or of the grand-jury proceeding in general, was made before the hearing. In fact, the tapes themselves, along with transcribed portions and a witness list, were not produced to the defendants until well into the ongoing hearing on the present matter. The startling production of these materials, disclosed for the first time during the testimony of Assistant Attorney General Michael Burns, who had previously vehemently denied from the witness stand that the State knew Brusini had committed perjury, is an example of the simply incredible assertions made by the State throughout the discovery process.
The State clearly knew Brusini had committed perjury and was facing prosecution for that crime. The evidence also establishes that the State agreed not to prosecute Brusini in return for his cooperation. Former Chief Prosecutor J. Richard Ratcliffe testified that during August or September 1992, while the grand jury was considering the case, he made an explicit promise to Brusini that he would not be charged with perjury in exchange for his cooperation in the DiPrete investigation. Ratcliffe also testified that the case was withdrawn from the grand jury at that time, before it reached any conclusion, in return for Brusini's agreement to cooperate. This testimony is corroborated by the date of Brusini's first signed proffer, September 30, 1992, which began the process of formally obtaining immunity for Brusini, as well as the testimony of Brusini's attorney who stated that he knew his client would not be charged with perjury based on negotiations with Ratcliffe.
Although the State had agreed not to prosecute Brusini for perjury as of September 1992, the ultimate grant of complete immunity to Brusini was not finalized until March 24, 1994. (Brusini was formally immunized the day of or the day before his testimony at the grand jury, which returned the instant indictment just five days later, suggesting the importance of his testimony to the case against the defendants.) During this period, high-ranking officials at the Department of the Attorney General were informed of Ratcliffe's deal with Brusini. Indeed, it appears that the State was holding the perjury deal over Brusini's head to ensure that he fully cooperated with the DiPrete investigation before receiving complete immunity. The evidence establishes that at least two separate meetings were held in May and October 1993, attended by members of the present prosecution team and the upper echelons of the Department of Attorney General, in which the agreement not to charge Brusini was specifically discussed as well as the prospect of charging Brusini with the crime because of his failure to cooperate fully and honestly.
Furthermore, Ratcliffe testified that in January 1993 he communicated to Attorney General Jeffrey B. Pine, who had recently been elected, that the State was prepared to indict Brusini for perjury and that negotiations were continuing on a final immunity deal. Ratcliffe also testified about meetings and conversations with representatives of the Department that took place after he had left his position as an assistant attorney general around May 1995. Specifically, Ratcliffe indicated that after the defendants had filed the present motion for sanctions he spoke to members of the prosecution team in September 1996 to ensure that the discovery requests would be corrected as related to the issue of Brusini's perjury. In addition, Ratcliffe visited the Department of the Attorney General in October 1996, after the present hearing had begun, to review several files connected with the case. At that time, while at the Department of Attorney General, he specifically told Deputy Attorney General Thomas Dickinson that he had made an explicit promise to Brusini on the perjury charge, and the information should have been provided to the defendants. Dickinson responded that he felt any deal made with Brusini was only an "understanding" rather than a promise and, therefore, would not be required to be disclosed. Ratcliffe disagreed and was soon confronted by both Deputy Attorney General Dickinson and Attorney General Pine who asked if he was sure that it was an explicit promise. Ratcliffe explained that there was no difference between the two and disclosure of the information was required by this court's orders.
No evidence indicating the State's knowledge that Brusini committed perjury or that the State had decided to forego charging Brusini was provided to the defendants prior to July 1996. The State contends that sufficient information was provided to the defense and directs the court to several exhibits that were produced during discovery. The State maintains that the information that could be extracted from this mass of documents adequately informed the defendants about Brusini's act of perjury, and therefore, they have suffered no harm. This argument is not persuasive. Even if the State's exhibits were to somehow establish that Brusini had in fact committed perjury, they would not in any way convey to the defendants the extent of the State'sknowledge of that crime, which is what was specifically ordered produced. Furthermore, in response to discovery orders that the State produce all promises, rewards, or inducements offered to witnesses, the State directed defendants to the formal immunity petition of Brusini. Nowhere does this document reflect the agreement not to charge Brusini with perjury in return for his full and honest cooperation, which played an important role in developing Brusini as a key trial witness.
The undisclosed perjury deal was important to the State not only to secure Brusini's cooperation but also as a method of presenting a "clean" witness at trial. The perjury agreement was neither included in the immunity petition nor disclosed in response to discovery obligations. The defendants, therefore, had no way of knowing that the State had made a deal with and would be presenting testimony by a known perjurer, that is, a witness that the State knew had lied under oath before. This kind of information is invaluable in a case such as this, built almost entirely upon the testimony of cooperating witnesses, because it impacts upon the witnesses' credibility before the jury on cross-examination. Testimony indicated that the State placed a premium on being able to present "clean" witnesses at trial. By consciously misleading the defendants and the court through inaccurate responses about the State's knowledge of criminal activity and promises, rewards, and inducements to witnesses, the State would have been able to do so.
Given the testimony of former Chief Prosecutor Ratcliffe, there can be no question, and the court concludes, that it was always intended that the State would shield Brusini from a perjury charge in return for his cooperation in this case. It is also clear that the prosecutors deliberately withheld that critical information in order to present a clean witness at trial. This the defendants had a right to know, not only under the Brady principles but also under Rule 16, the original stipulation between the parties, and the court order of August 24, 1995.
Furthermore, it is apparent that significant changes were made to Brusini's proffer during the eighteen-month period in which the State and Brusini were negotiating Brusini's cooperation. Information related to these changes was withheld from the defendants in violation of the court's orders to produce inconsistent statements by witnesses. For example, in Brusini's final proffer and in his testimony to the grand jury that returned the indictment against the defendants, Brusini stated that he met with defendant Edward D. DiPrete, then governor of the State of Rhode Island, and discussed a cash payment made to DiPrete in return for the award of a state lease. The withheld material, however, indicates that Brusini had, on two occasions during the period in which he was negotiating his cooperation agreement, informed the State that another individual was at this same meeting, which information would constitute a prior inconsistent statement. Moreover, this information would be very helpful to the defense in investigating the charges and developing an additional witness, particularly because the individual involved later denied any knowledge of this wrongdoing when interviewed by the State Police. By failing to disclose this information, the State violated the court order to produce inconsistent statements and also denied the defense access to a potentially vital defense witness.
In a similar vein, information related to the State by Brusini about a suspicious payment made to Brusini by a state contractor was withheld from the defense. Brusini had told the prosecutors that he received a "loan" of $52,000, of which $25,000 was delivered in cash from a state contractor, made at a time when the contractor was receiving work from the State in connection with the Veteran's Auditorium. The withheld materials indicate that in February 1992 Brusini told the State that he needed the money for personal reasons such as vacation trips to Florida with his girlfriends. The information disclosed by the State omits that revelation, leaving open the possible conclusion, from Brusini's final proffer and from released grand-jury transcripts, that the money paid to Brusini was part of the larger conspiracy in which the defendants were allegedly involved. The State contends that because they had no actual proof that this transaction conclusively involved criminal activity, they were not required to disclose the statements by Brusini. The State's admitted belief that Brusini was not being truthful about the nature of this "loan" despite having agreed to cooperate fully and truthfully, however, suggests that the continued cooperation was another promise, reward, or inducement made to Brusini. Furthermore, given the context and the nature of the earlier statement, it is somewhat inconsistent with Brusini's grand-jury testimony and should have been produced on those grounds.
In any event, this issue is yet another troubling example of the manner in which the State built and presented this case to the grand jury and then relied on subjective, technical and semantic distinctions in explaining away their failure to comply with the court's orders and their own stipulation.
The situation relative to another major witness, Frank N. Zaino, is similar. It is apparent that Zaino was identified as a source of information for this case as early as October 1991 and was meeting with representatives of the Attorney General by December 1991. Negotiations related to the contents of Zaino's proffer continued through 1992, culminating in a sworn proffer in October 1992 and testimony before a grand jury in November 1992 and May 1993. Documents included within "the thirty boxes," which were not produced until July 29, 1996, include several draft proffers from Zaino along with notes of several interviews with Zaino. The notes are dated between the time of December 1991 and September 1992 and clearly relate to the information included within the draft proffers. Each of these contain statements on a variety of matters such as the individuals present at meetings in which the central alleged conspiracy was discussed as well as details of payments made to the defendants, which differ from Zaino's final proffer and grand-jury testimony. This information indicating that Zaino's proffer was negotiated over a series of meetings and interview sessions was specifically ordered to be produced as prior inconsistent statements, as well as notes of interviews with witnesses.
Perhaps more troubling is the conduct of the State after they had secured Zaino's proffer and initial testimony at the grand jury in November 1992. The withheld documents indicate that meetings and interviews with Zaino continued through 1993, and even up to February 1996, for the admitted purpose of "cleaning up" Zaino as a trial witness. For instance, as a result of the investigation into Zaino and his business, F.N. Zaino 
Associates, the State concluded that Zaino had committed tax fraud by claiming business deductions for nondeductible personal expenses. In the first instance, a full and complete statement of the State's knowledge of this activity was not provided to the defendants although ordered by this court. The State argues that the production of a mountain of other documents used by the State to conclude that Zaino had in fact committed tax fraud was adequate to inform defendants of this fact. The State's claim on this point is specious; the State cannot attempt to redefine for themselves the nature of a court order. The State was ordered to produce their knowledge of criminal activity, not material that may suggest it took place.
More importantly, however, the evidence establishes that the State became involved in the filing of an amended tax return designed to ensure that Zaino would be sufficiently sanitized before appearing at trial. Specifically, by way of a letter dated July 30, 1993, the Department of Attorney General notified Zaino's attorney that Zaino would be required to file an amended tax return in order to account for the income he obtained as a result of the inappropriate deductions. Former Chief Prosecutor Ratcliffe, author of the letter, testified that it was his intention to ensure that he would be representing a clean witness before the jury rather than one that the defense could cross-examine with evidence of tax evasion.
In addition to the letter, the State provided Zaino with the results of an investigation conducted by state auditors that originally concluded that Zaino had fraudulently obtained over $500,000. Nearly two years later, on March 2, 1995, representatives of the State met with Zaino, his lawyers and his accountants, to discuss the filing of an amended return including this income that was fraudulently obtained between 1988 and 1990. Although Zaino's accountants had performed no independent analysis, they disputed the figures presented by the State. On March 13, 1995, the State presented Zaino with a memorandum containing an amount arrived at by another state auditor, which was some $340,000 less than the original conclusion.
Following these meetings, Zaino's accountant filed amended state and federal tax returns for the year 1991 reporting additional income of $155,270, which was the same amount provided by the State in a March 13, 1995 memorandum. Zaino's accountant testified that he performed no independent analysis of Zaino's finances and simply reported the amount provided to him by the State. Indeed, the amended returns both explained that the amendment was due to the results of an investigation by the Rhode Island Attorney General. Furthermore, although the amended return was filed exclusively for the tax year 1991, it actually reported income earned in the years 1988 through 1990, thereby avoiding additional penalties and interest by claiming the entire amount in a single, later year. The State was fully aware of this fact and at the least tacitly approved of Zaino's plans. In addition, the State never prosecuted Zaino for tax evasion or notified the Internal Revenue Service or the proper State officials of any of these facts. When taken as a whole, the sum of the State's actions connected with the filing of the amended return indicate at least the State's knowledge of that tacit complicity in tax evasion, if not outright assistance. It is beyond question that these actions represent a promise, reward, or inducement to Zaino offered to secure his continued cooperation and present him in the best possible light as a "clean" witness.
Another extreme example of the lengths to which the State would go to ensure that it would present clean witnesses at trial also relates to Zaino. Among the documents required to be produced in August 1995, but not disclosed until July 1996, are notes of an interview with Zaino where he admits to the crime of filing a false affidavit in the Rhode Island Family Court. By the State's own admissions, primarily through the testimony of Special Assistant Attorney General Bruce Astrachan, members of the present prosecution team were specifically aware that Zaino had set up a separate bank account in 1990 to hide money from his wife during their divorce. Zaino admitted to the prosecutors that a DR-6 Affidavit filed with the Rhode Island Family Court in connection with the divorce and signed by Zaino under oath was false due to the omission of the secret bank account. The State took no action in prosecuting Zaino for this crime, and no evidence of the admission by Zaino, or of the State's decision to forego prosecution, was disclosed to the defendants prior to July 1996.
Even more troubling is the State's admitted failure to bring this matter to the attention of the Family Court. Current members of the Department of the Attorney General, sworn to uphold the laws of this state, had before them the admission of a party to a proceeding in a Rhode Island Court of law that he had knowingly filed a false affidavit with the intent to defraud the court and they chose to do nothing. Not only did the prosecution fail to produce this information in the present case as knowledge of criminal activity of a witness but they, as officers of the court, also failed to inform the Family Court itself, which they were indisputably required to do. Despite the State's claims that there is no evidence that this was meant as a promise, reward, or inducement to Zaino, there can be no question that the State kept this information to itself in order to protect the credibility of a trial witness. The failure to prosecute Zaino and inform the defendants of both the crime and the decision not to prosecute are clearly part of the larger scheme to ensure his cooperation and present him at trial as a clean witness.
To a lesser degree, but of equal importance on the issue of misconduct, is the information withheld by the prosecution relative to prospective witnesses Michael Piccoli and Mathies Santos.
It appears that the State was investigating Piccoli sometime prior to April 1992 for his involvement in fraudulently billing the City of Cranston on construction projects. Piccoli pled guilty to charges arising out of that investigation, and former Chief Prosecutor Ratcliffe appeared at his sentencing hearing to recommend that he receive no jail time and pay restitution in the amount of $135,000, an amount significantly lower than the amount he fraudulently obtained. Ratcliffe testified that his appearance was part of the agreement between Piccoli and the State in exchange for Piccoli's cooperation in the present case and that the recommended restitution figure was partly in exchange for his cooperation. Although the State did reveal some information about the guilty plea and resulting sentence, it did not disclose the extent of the State's cooperation, nor did it indicate that the State's actions were part of the promises, rewards, or inducements made to Piccoli for his cooperation in the case against the defendants, which it was required to do.
Related to this issue is the effect that the State's agreement with Piccoli had on an ongoing federal investigation of Piccoli. Among the withheld documents was a letter from then United States Attorney Lincoln Almond to then Rhode Island Attorney General James O'Neil, dated April 17, 1992, cautioning the Department of Attorney General that any cooperation agreement made between Piccoli and the State would jeopardize a federal investigation. Despite this knowledge, the State entered an agreement with Piccoli, thereby impeding the federal Hobbs Act investigation. Although, as the State points out, the conflict between the federal case and the state case was published in the newspaper and was a matter of public record, the letter from the United States Attorney certainly was not. This letter, moreover, is central to the nature of the deal made with Piccoli, and the fact that the State's agreement not to prosecute Piccoli hindered the federal investigation should have been disclosed as part of the promises, rewards, or inducements made to Piccoli.
As to Santos, several of the withheld documents indicate the State's knowledge of criminal activity, although not conclusively established or charged. None of this information was disclosed, despite the requirement to produce a full and complete statement of the State's knowledge of criminal activity, whether it resulted in a conviction or was never even charged. Specifically, the material indicates Santos' involvement as a state official in various schemes to benefit Joseph Mollicone, Jr., who had given Santos a substantial loan despite his poor credit. For example, Santos helped obtain a change order payment of some $650,000 to a realty trust in which Mollicone was a partner. Santos also pressured state agencies into signing leases that benefited Mollicone's real estate interests. Each of these acts would constitute a conflict of interest because of Santos' official position on the State Properties Committee, as well as possible bribery and/or extortion. The State was required to produce any knowledge of criminal activity, whether or not the crimes were actually charged.
Being faced with the prospect of having to admit that eighty-seven of the eighty-nine documents referenced by defendants were not produced as required, the State in its cross-examination of the witnesses called by the defendants sought to minimize their importance by pointing to and offering into evidence other documents in the possession of defendants from which the State says the information could have been extracted. There were also indications from the State that it would produce relevant evidence to support its position when presenting its case. What was produced, by agreement, were approximately 240 exhibits which when summarized, constituted basically a conglomeration of financial documents and work papers, some of which referenced bank transactions, and in the case of Zaino, accountant work papers. Certain of these documents convey a limited amount of information relevant to some of the defendant's claims. For instance, a careful review of some of the exhibits reveals that Brusini had an ownership interest in the Rosemac building which he failed to include in financial statements and denied before a grand jury. The limited information disclosed in these exhibits, however, does not in any way indicate that the State was contemplating and pursuing a perjury charge against him.
The court is satisfied that these exhibits do not support the State's position that a thorough analysis of the exhibits by defendants would have revealed the criminal conduct of certain witnesses. In any event, the exhibits offered by the State do not represent a full and complete statement of the State's knowledge of criminal conduct by its witnesses, or reference the promises, rewards, and inducements made to those witnesses, as required by court orders.
Also among the exhibits were copies of the notebooks of State Investigator Peter Blessing, grand-jury testimony of some eighty persons, and Brusini's proffers. The production of these documents, which might suggest that potential witnesses may have engaged in wrongdoing, is insufficient to constitute compliance with disclosure principles in light of the court's order requiring the State to disclose its specific knowledge of witnesses' criminal conduct. This is especially true given the contents and nature of the withheld documents appended to defendants' motion for sanctions, which clearly included the required information.
The State seems to suggest that defendants were to divine from a varied and often obscure mass of documents to be found within the six hundred boxes, among other things, Brusini's perjury and the State's forbearance in prosecuting him, Zaino's tax fraud, and the false Family Court affidavit as well as criminal misconduct of Piccoli and Santos. The defendants, however, were not required to search out this information, even if that were possible. Rather, the prosecutors were under an obligation to produce the requested information that they knew was in their possession or with due diligence should have discovered. It is clear from the testimony at the hearing that no one prosecutor with disclosure responsibility had reviewed all the documents generated during the State's investigation of the defendants. There is even a question of whether they each reviewed the contents of the withheld thirty boxes that yielded the exhibits appended to defendants' motion for sanctions.
The State has the temerity to suggest to the court that defendants should have gleaned information contained in the withheld documents from the mass of material that the prosecutors themselves admittedly did not review in its entirety. The prosecution, therefore, could not accurately represent to the court, although they did on several occasions, that defendants were in possession of all exculpatory material. Under the circumstances, given the admissions of prosecutors during the hearing, such a suggestion is specious and further brings into question whether the prosecutors truly understand their responsibilities to a defendant as well as to the court.
The State repeatedly made late disclosures of exculpatory material only after the defendants suggested that such material existed and had not been produced, despite the protests of prosecutors that defendants already "had it all." It became clear to defendants that they could not rely upon the State's declarations relative to disclosures and found themselves on the horns of a dilemma. That is, defense counsel could proceed to trial without knowing if all exculpatory material to which they were entitled had been produced, running the risk that it had not, and their clients would therefore be denied their constitutional right to effective assistance of counsel. Or on the other hand, they could seek the imposition of sanctions for what they believed to be prosecutorial misconduct that effectively would deny defendants their constitutional right to a speedy trial.
In selecting the latter course, which they were no doubt entitled to do, defendants allege it became necessary to inquire into the content of withheld documents that impacted upon the credibility of the State's witnesses. They allege that this inquiry further weakens their effectiveness in cross-examination because they have had to reveal elements of their trial strategy to the prosecutors during this hearing by indicating exactly how the withheld material is exculpatory and how it would be used at trial to impeach the State's witnesses. Defendants claim they have been forced to surrender the element of surprise, which is vital to effective cross-examination, in an effort to ensure that their clients' constitutional rights to exculpatory information prior to trial be protected. The defendants argue that this result, thrust upon them by prosecutorial misconduct, constitutes substantive prejudice which a continuance for any length of time cannot cure.
In determining the impact the admittedly withheld documents had on defendants' rights, the court is to employ a "sliding scale" analysis based upon the blameworthiness of the prosecution in failing to disclose the evidence, as adopted by the Rhode Island Supreme Court and most recently repeated in Brisson, 619 A.2d at 1102. It becomes necessary for the court to characterize and label the prosecution's conduct relative to the acknowledged nondisclosures and its effect upon defendants' due process rights. Throughout the proceedings and in their argument against sanctions, the State's prosecutors seek to excuse their admitted violations by pleading inadvertence and good-faith attempts at compliance which, as previously noted, amounts to procedural prejudice remedied by a reasonable continuance. The defendants counter that the prosecutors' conduct was deliberate with dismissal of the indictment or precluding the testimony of key witnesses as the only appropriate remedy.
Deliberate nondisclosure connotes either "a considered decision to suppress . . . for the purpose of obstructing" or the prosecution's failure "to disclose evidence whose high value to the defense could not have escaped . . . [its] attention." Id. at 1103. (Citation omitted.) Inadvertence has been legally defined by such terms as heedlessness, lack of attention, want of care or carelessness. Black's Law Dictionary 759 (6th ed. 1990). While the concept of good faith is not easily defined, its common usage generally describes a "state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." Black's LawDictionary 693 (6th ed. 1990). (Citation omitted.) Using these basic definitions as a framework, the court will analyze the State's attempt to excuse their admitted failures by pleading inadvertence and good-faith conduct.
An objective analysis of the prosecutors' conduct throughout the discovery process, highlighted during the hearing, does not support their position and does not absolve them of the pervasively prejudicial effect the conduct had upon the defendants in the preparation of their case. The State's cavalier attitude toward fulfilling their discovery obligations began as early as December 1991 when a state investigator recommended that a more effective document control system be implemented because of the volume of materials being received. Testimony by former Chief Prosecutor Ratcliffe, and by the paralegal responsible for control of the discovery material, indicated that no changes were made to the overburdened system. Likewise, there was at that time no inventory system in place to account for witness interviews and statement or any system to ensure that all interested personnel were kept informed, other than informal meetings. Given the size and importance of the investigation, the prosecutors' failure to act early on to head off the anticipated problems relating to document control cannot be excused and is evidence of their conscious disregard for the defendants' rights in this regard, which clearly played a part in their failure to effectively meet their discovery obligations. This can hardly be considered faithfulness to one's duty or obligations and, therefore, does not support the State's claims of good faith.
The prosecutors' repeated reliance on the representations of others involved in the investigation relative to discovery compliance is further evidence of their reckless disregard for their constitutional obligations. For example, the Special Assistant Attorney General who admittedly filed inaccurate responses to defendants' discovery requests explained away that failure by indicating his reliance upon the assertion of others on the prosecution team that the responses were accurate. Another fact that militates against the inadvertence, good-faith argument of the State is its desire to put a high value upon presenting "clean" witnesses at trial by concealing information that might affect their credibility. For example, the decision not to prosecute Brusini for perjury; the assistance provided to Zaino in amending his fraudulent tax returns; the State's knowledge and tacit acquiescence in Zaino's filing a false affidavit with the Family Court; and the State's indifference to the effect immunity for Piccoli had on possible federal offenses. The importance of these facts is that they were not disclosed until one year after the State was ordered to produce such exculpatory information.
It is admitted that documents from which the specific information outlined above was gleaned were contained within ten of the thirty boxes produced in July 1996. Most of the material came from the working files of former Chief Prosecutor Ratcliffe, State Investigator Peter Blessing, and State Police Sergeant Robert Mattos. The ten boxes were assembled in August or September 1995 and were specifically reviewed by the current prosecutors to locate all documents that were either responsive to the court's August 24, 1995 order or would be produced directly to the court for an in-camera inspection to protect privileged matter. The current prosecutors, therefore, must be charged with the knowledge of the contents of those boxes since there was evidence that they reviewed them for the specific purpose of responding to the court's orders.
The court cannot accept the State's claim of inadvertence or a good-faith failure to locate and produce the material within these ten boxes. All of the material falls within the purview ofBrisson, supra, as "evidence whose high value to the defense could not have escaped . . . [their] attention." Brisson, 619 A.2d at 1103. There is no argument that the documents containing the withheld material were relevant and therefore required to be produced. It is wholly unreasonable to conclude that experienced prosecutors would fail to find materials for which they were searching to respond to discovery requests or court orders or, if found, that their importance failed to register with them. The more reasonable inference is that prosecutors were aware of the material by September 1995 but nonetheless chose not to comply with the court's orders.
The court finds all of these factors to weigh heavily against a finding that the prosecutors were making a good-faith attempt to comply with court orders, constitutional obligations, and their own ethical responsibilities. Rather, the only reasonable inference to be drawn is that the prosecutors acted deliberately with the intent to mislead the defendants and the court resulting in substantial prejudice to the defendants.
The court finds that the prosecutors in this case have engaged in a willful and deliberate course of misconduct contributed to by a lack of due diligence, resulting in repeated violations of Super Ct. R. Crim. P. 16, Brady principles, the stipulation between the parties and, most egregious of all, the court's orders. The court also finds the pattern of misconduct to be so pervasive that the defendants have suffered substantive prejudice warranting a remedy beyond a mere continuance, which the State argues is the only one that the court has the authority to order.
In fashioning an appropriate remedy, the court is guided by established criteria from a line of Rhode Island cases, principally Coelho and Brisson, supra, and Super. Ct. R. Crim. P. 16 (i), granting the court virtually unrestricted discretion in dealing with discovery violations. According to the four-factor test of Coelho, a finding of deliberate nondisclosure by the State may be dispositive, resulting in sanctions without a consideration of the harm produced by the misconduct. Garcia, 643 A.2d at 187. See also Brisson, 619 A.2d at 1102-03; Ramos, 553 A.2d at 1068. While most discovery violations are revealed during or following trial and therefore result in a grant of a new trial to the defendant, the present case is before the court on a pretrial motion for sanctions. The State therefore argues, despite the deliberate nondisclosure in contravention of the defendants' constitutional rights, that this court has no power other than to grant a continuance.
The court has no need to look to other jurisdictions for authority for a pretrial preclusion of witnesses' testimony or dismissal of an indictment. In the court's opinion, State v.Quintal, 479 A.2d 117 (R.I. 1984), and Super. Ct. R. Crim P. 16 (i) provide sufficient authority if the nondisclosure circumstances are such as to warrant these sanctions, as urged by defendants. The court finds that the only reasonable inference to be drawn from the cumulative acts as outlined herein is that the prosecutors acted deliberately during the pretrial stages of this case. This misconduct resulted in substantial prejudice to the defendants warranting the severest of sanctions.
In Quintal, the Rhode Island Supreme Court affirmed a pretrial dismissal of an indictment based upon the State's failure to produce court ordered discovery that remained unproduced when the case was dismissed. The State seeks to distinguish the facts in Quintal from those in the present case by alleging that all discoverable material has been produced. Given the history of the prosecutors' actions in this case and the fact that additional discovery material was found and forwarded to defendants on February 5, 1997, long after the hearings were concluded, the court cannot rely on the State's representation that the defendants are now in receipt of all exculpatory material, nor should the court require the defendants to do so. Apart from that very important fact is that in Quintal
the discovery consisted of specifically identifiable medical records and not the unidentifiable, amorphous mass of information present in this case. As to the State's argument of inadvertence, the court in Quintal stated that it made no difference to the outcome because "[i]t would be unfair to allow the State the tactical advantage of surprise gained by violating, whether intentionally or unintentionally, the rules of discovery."Quintal, 479 A.2d at 120 (quoting State v. Darcy, 442 A.2d 900, 903 (R.I. 1982)).
Likewise, under Super. Ct. R. Crim P. 16 (i) governing sanctions for discovery violations, "a trial justice is clearly free, within the bounds of sound discretion, to enter any order he or she deems most appropriate." Quintal, 479 A.2d at 119. In affirming the pretrial dismissal pursuant to Rule 16 (i), the court in Quintal noted that "[i]t is within the trial justice's discretion to impose a sanction for noncompliance with a criminal discovery order in light of the attendant circumstances of a given case." Id. (citing State v. Silva, 118 R.I. 408, 411,374 A.2d 106, 108 (1977)).
The manner and magnitude of the prosecutorial misconduct found by the court to exist in this case has not only resulted in substantial prejudice to the defendant, but has the effect of eroding confidence in the criminal justice system. This is further exacerbated by evidence during the healing indicating that the highest officials in the Department of Attorney General were aware of the withholding of at least one critical piece of exculpatory material.
Of equal concern is that the situation also raises the alarming specter that the system works only if an accused has the financial resources to make independent investigation prior to trial to ferret out misconduct to ensure due process.
At the very least, the court would be justified in precluding the testimony of the witnesses for the State (Brusini, Zaino, Piccoli, and Santos) but that remedy does not effectively respond to the evidence. It does nothing to impress upon the prosecution that it cannot be allowed to benefit from having acted in a manner that is less than constitutional and ethical in the pursuit of convictions.
Since the court has found that there has been a pattern of deliberate misconduct resulting in repeated violations or Super. Ct. R. Crim. P. 16, Brady principles, the stipulation between the parties, and the court's orders, all counts of the indictment, except the severed counts 23 and 24, are dismissed.